```
***********************************************************************
                                      )
IN RE:                                )
                                      )
TYRONE HOSPITAL                       )    Case No. 06- 70759 BM
                                      )
                                      )
     Debtor                           )    Chapter 11
                                      )
                                      )
                                      )
                                      )
***********************************************************************
```

## DISCLOSURE STATEMENT IN SUPPORT OF
## PLAN OF REORGANIZATION OF DEBTOR-IN-POSSESSION
## DATED MARCH 1, 2010

COMES NOW the above named Debtor-In-Possession, by and through his attorneys, Spence, Custer, Saylor, Wolfe & Rose, LLC and does file the within Disclosure Statement In Support Of Plan Of Reorganization Of Debtor-In-Possession Dated March 1, 2010, upon a cause whereof the following is a statement, to wit:

### I.  INTRODUCTION

The instant case was commenced by the filing of a voluntary petition for relief by the Debtor, Tyrone Hospital ("Tyrone") pursuant to Chapter 11 of Title 11 of the U.S. Code, 11 U.S.C. Section 101. Said case was commenced on September 29, 2006.

As a debtor-in-possession, Tyrone has remained in control of its assets, subject to Court approval of outside of the ordinary course transactions and the "oversight" provided by the Office Of The United States Trustee, as well as the by the Official Committee of Unsecured Creditors (the "Committee").

The goal of the filing was the formulation and development of a Plan Of Reorganization confirmable pursuant to 11 U.S.C. Section 1129.

Upon the commencement of the case, the Debtor sought and obtained authority to retain James R. Walsh, Esq. of Spence, Custer, Saylor, Wolfe & Rose, LLC to represent it and assist it in its Chapter 11 case.

A Committee was appointed and organized pursuant to Section 1102 of the Code. The Committee, as appointed by the Office of The United States Trustee, consists of National City Bank, Trustee of an Irrevocable Trust For The Benefit Of A Minor Child, Adara Health Staffing, Inc., and Beckman Coulter, Inc. As permitted by law, the Committee sought Court approval to retain counsel chosen by it and a financial advisor chosen by it. These were, respectively, George Snyder, Esquire, of Stonecipher, Cunningham, Beard & Schmitt and Mark Gleason. Both were approved for retention by the Court.

This case had progressed to the point that the Debtor had

proposed a Plan of Reorganization dated as of August 1, 2007 as well as a Disclosure Statement filed in accord with Section 1125 of the Code, in furtherance of said Plan, the provisions of said Plan and Disclosure Statement being incorporated herein.

At the time of the hearing to approve the Disclosure Statement, held in October of 2007, it was determined that given the number of claim objections that needed to be resolved, and the effect that the resolution one way or the other could have on the distribution to be afforded to the holders of timely filed allowed general unsecured claims not entitled to priority, that the disclosure statement should not be approved, and that upon the resolution of the claim objections, which are reviewed below, that a new and revised Plan and Disclosure Statement would be filed providing for the treatment of the unsecured claims based upon the resolution of the claims that were to be objected to by the Debtor or other party in interest.

As of this date, all objected to claims have been resolved and the Orders either resolving the same or approving settlements reached regarding the same have become final, with one substantial exception. A settlement proposal is pending for the settlement of the Qui Tam action filed under the False Claims Act, 31 U.S.C. Sections 3729-3732 by Relators Thomas Bartlett and Kimberly Gummo, however, the same requires the approval of the United States, which is also pending.

The Court, in the exercising of its discretion, has directed that the Debtor file a Plan and Disclosure Statement by March 11, 2010, or the case would be dismissed.

Accordingly, after consultations with the Committee through its counsel, the within Disclosure Statement In Support of Plan Of Reorganization Of Debtor-In-Possession Dated March 1, 2010, and its companion Plan Of Reorganization Of Debtor-In-Possession Dated March 1, 2010 are being filed.

The purpose of the within Disclosure Statement is to provide creditors with sufficient detail and information that a hypothetical creditor/ investor, typical of the holders of claims and interests in this case, can make a knowing and informed decision as to whether to vote in favor of or against the pending Plan of Reorganization Of Debtor-In-Possession Dated March 1, 2010.

## II.  VOTING

Creditors may vote to accept or reject Tyrone's Plan of Reorganization dated March 1, 2010. **ONLY the votes of creditors that actually vote in favor of or against the pending Plan will be considered in determining whether the Plan is accepted or rejected. A creditor that fails to vote to either accept or reject the Plan is making a decision to allow the decision of those creditors that vote to control the decision making process.**

A class of creditors shall be determined to have accepted the Plan if, in good faith, two-thirds (2/3) in amount and more than one-half (½) in number of the voting members of the Class vote to accept the Plan. The Plan shall be confirmed if each impaired class votes to accept the Plan.

In the event an impaired class of creditors does not vote to accept the Plan, the Court may nevertheless confirm the Plan if it finds the Plan meets the requirements of Section 1129 of the Code, specifically, that the Plan does not unfairly discriminate among Classes, that each holder of a non-accepting class shall receive at least what it would have received in a Chapter 7 liquidation, and that no holder of a junior claim or interest shall receive any distribution or retain any interest unless all senior classes/ interests are paid in full.

Even if a junior class or interest will receive a distribution or retain an interest despite non-payment in full of senior classes, and non-acceptance by the same, the Court may, under certain circumstances, confirm the Plan through the invocation of certain judicially created exceptions to the "absolute priority" rule set forth above.

**Remember, only those creditors that vote will participate in the decision making process.**

### III.   PRE-PETITION HISTORY OF DEBTOR

As noted supra, this is a Disclosure Statement in support of a Plan Of Reorganization.

The Plan of Reorganization is premised upon the use of the Debtor's income streams from operations to fund payment arrangements that will service the secured debt of Omega Bank not being paid off as of the "Effective Date", as well as to satisfy the allowed administrative and priority claims, and to, out of a fund heretofore created, via a lump sum payment to be paid into a "fund" to be administered by the Committee, and distributed by the offices of counsel to the Committee, which will be distributed on a pro-rata basis to the holders of allowed general unsecured claims not entitled to priority as set forth below.

Tyrone is a community hospital that provides in-patient and out-patient health care to the residents of Tyrone and surrounding communities requiring and desiring to utilize its services.

The hospital is owned by and governed by a non-profit corporation that has been accorded tax-exempt status by the Internal Revenue Service under Section 501(c) of the Internal Revenue Code.

The hospital is governed by a community based Board of Directors who are not compensated for their services, and are elected by the members of the community that subscribe to the supporting group.

Unfortunately, despite a long history of meeting the needs of the community in a financially responsible manner, Tyrone, in the late 90's and from 2000 to the filing of this case, suffered a series of financial setbacks. These setbacks were not unique to Tyrone, rather, they were the same setbacks and challenges that were being faced by the vast majority of hospitals in general and smaller community hospitals in particular.

These challenges included reduced reimbursement levels by Medicare and Medicaid, which pay for a substantial part of the

hospital's patients health care services, given the aging and unemployed in the Debtor's service area (at the time of the drafting of this Plan Pa. was per a number of rating facilities, in the lower 40's in the states as to the amount of Medicaid reimbursement, (it is not affected by Medicare reimbursement due to its status as a Critical Access Hospital)); reimbursement by other third party payors not keeping pace with the rising costs of providing quality health care; the previously existing physician base being reduced due to retirements and relocations of physicians, and the inability to recruit new physicians to the area due to the decreasing number of new physicians v. the number of established physicians retiring or relocating to bigger cities to join Groups that require less time and hours as the physicians transition to retirement, which results in less admissions and out-patient testing at the hospital; the difficulty in recruiting younger physicians to locate to rural areas to practice due to their desire to remain in larger metropolitan areas and to practice at tertiary and/or teaching facilities, and to engage in specialty practices rather than primary care practices; the increasing costs of malpractice coverage in the Commonwealth of Pennsylvania; and the increasing costs of maintaining competitive salary structures for the nursing and other provider staff.

After a relatively long and stable tenure in the CEO and CFO position at Tyrone, in 1999, Quorum Health Resources, (QHR) the management company responsible for the CEO position at Tyrone, made a change in the CEO position. The position was filled by QHR and when the CFO position opened up shortly there after, it too was filled by QHR.

The departing CFO had been at Tyrone for over thirty years. The new successor CEO and CFO candidates came aboard and unfortunately, struggled in their new roles.

The challenges of the time for healthcare as outlined above, the operational turmoil with two new leaders, and the turnover of physicians, (between 2000 and 2006, 74 doctors left Tyrone's Medical Staff, between retirement and relocation) led to significant operational losses in 2001 and continued to the present date.

The financial condition and effect of the above problems at Tyrone can be best exemplified by the "bottom line" of the Hospital during the recent years. In 2000, the facility ended the year with a positive bottom line of $1,682,335.00. The losses for 2001 were ($1,762,071.00), for 2002 ($3,395,740.00), for 2003 ($2,533,884.00), for 2004 ($1,818,248.00), for 2005 ($1,192,229.00), and for 2006 ($3,921,007.00).

In 2003 both the CEO and CFO, who were employed by Quorum, were released from their positions at Tyrone. An interim CEO and CFO were brought in to "operate and manage" the hospital while a search was being conducted for permanent replacements.

This led to the CEO position being filled with a permanent candidate in the spring of 2004 and the CFO position being filled with a permanent candidate in January of 2005. These individuals, Walter Van Dyke, CEO, and George Berger, CFO, continued in their respective positions through the commencement of this case.

Effective June 30, 2006, the Board elected to terminate the

management contract with Quorum, with the understanding and agreement that the CEO and CFO, who, as noted supra, had been Quorum employees, would be released from their Quorum contracts, including certain non-compete provisions contained therein, and would and could contract directly with Tyrone to perform the duties of their respective positions. This in fact occurred.

Initiatives taken by the management team of Van Dyke and Berger, and the senior leadership of the medical staff, to right the financial performance included obtaining the designation for Tyrone as a Critical Access Hospital. This status allowed Tyrone to improve its reimbursement from medicare, as it allowed reimbursement on a cost plus basis, rather than the conventional medicare DRG basis. In 2006, the decision was made to cease providing Obstetrics Services, due to the cost of providing the same far exceeding the reimbursements received for providing the service.

In 2005, Tyrone sought and became the recipient of a $500,000 Federal Grant to upgrade its information system.  The installation was completed by the end of 2007.

A consultant was retained to revue permissible revenue cycle enhancements, and these were implemented.  Management engaged in the negotiations and renegotiations with payors of contracts which contained improved reimbursement. Recognizing the diminishing physician base that practiced in Tyrone and therefore utilized Tyrone as the hospital of choice, a concerted effort was made to recruit new physicians to the area to meet the needs of the community. This culminated in the  recruitment, in 2005 and 2006, of a pediatrician, general surgeon and two E.R. physicians.

Tyrone Medical Associates ("TMA"), a wholly owned subsidiary of Tyrone, which housed physician practices for physician's employed by TMA, was reorganized to reduce the Hospital's subsidy by 400 thousand dollars a year.

Unfortunately, despite the above improvements, Tyrone continued to incur losses that caused management and the Board to consider alternatives for the safeguarding of the hospital and to assure its continued ability to provide health care services to the community it serves.

Tyrone had been named as a Defendant, along with others, in a qui tam action in federal court in which the relators/plaintiffs were a former executive at Tyrone and his assistant. The complaint alleged that in years past (long prior to the involvement of management in the several years preceding the commencement of this case), Tyrone engaged in activity with certain physicians that was in violation of Stark regulations/law, and damages were being sought that could exceed $10,000,000 under the False Claims Act, 31 U.S.C. Sections 3729-3732. Tyrone disputed the allegations, and denied any liability, however, payment of the costs of defense, including counsel fees, alone could effectively drain Tyrone's available funds and force it into liquidation.

The period from January through June of 2006 saw cash operating losses of, on average, $250,000 per month. This was causing the remaining cash reserves to be depleted, and in fact the corporation faced the prospect, if action was not taken, of exhausting its

reserves within six to nine months.

This was further complicated by the fact that the hospital had, for employees, a defined benefit pension plan. The plan was, as were most such plans, not fully funded. If action was not taken, Tyrone would have been required, in 2006, to contribute over $853,000 as its required minimum contribution to the plan. This amount of surplus cash was simply not available to Tyrone.

Finally, Tyrone, due to the application of Pennsylvania's liability law, incurred a substantial adverse verdict in a malpractice case, which exceeded available insurance coverage, and lacked the funds to satisfy the amount of the verdict that exceeded available coverage.

Tyrone was, facing the fiscal challenges that are described above, therefore referred to reorganization counsel, James R. Walsh, Esquire, of Spence, Custer, Saylor, Wolfe & Rose, L.L.C., to seek his input as to the options and alternatives available to Tyrone.

After considering all options available, the Board, upon the recommendation of management, elected to seek protection under Title 11 of the U.S. Code, and commenced the instant proceeding under Chapter 11 of the Code on September 29, 2006.

## IV.  POST-PETITION HISTORY OF DEBTOR

Having sought and obtained relief under the provisions of Title 11, Tyrone and its management and Board immediately began formulating what would evolve into the Plan of Reorganization as proposed herein. The efforts of the Board and management were focused upon emerging from Chapter 11 with a Plan of Reorganization that was feasible and could be performed, and also, which would assure that Tyrone could and would continue to provide needed community hospital based in and out-patient services to the residents of Tyrone and the surrounding communities for years to come.

As it has evolved, Tyrone's plan to emerge from bankruptcy focuses on the increasing of its patient activity over a period of the next six years.  Starting in year one, Tyrone will strive to increase its annual admission rate by 147 the first year, (this is less than the 2005 admission rate) 128 the second year, 99 the third, 75 the fourth, 47 the fifth year and 49 the sixth year.  This will be accomplished by recruiting additional physicians, and the refocus of a present general surgeon to Tyrone Hospital vs. several hospitals.

A number of matters have occurred post-petition to improve the financial position of the hospital and its prospects for a successful reorganization.

As provided for under the Code in a case involving a health care provider, the Court, upon the commencement of the case, issued a Rule To Show Cause why a patient ombudsman should not appointed to represent the interests of patients in this case. The Office of the United States Trustee ("UST") filed pleadings supporting the appointment of an individual to fill the position. The Debtor filed pleadings opposing the appointment, asserting that there was no need for the position, as between the Pa. Dept. of Health, the Joint Commission On The Accreditation Of Hospitals, inspections and reviews

by third party payors, and the absence of citations regarding patient care, that the functions of the position were effectively being met by the said organizations/entities, and the costs of the position would unnecessarily deplete Tyrone's assets.

After hearing and argument, the Court ruled, by Order dated November 6, 2006, that there was no need, on the facts as they existed at that time, for the appointment of an ombudsman.

Tyrone undertook a review of its executory contracts to determine whether there were executory contracts in place that fiscal prudence dictated be rejected, to remove unneeded financial burdens from the Debtor. This led to the filing of the following Motions To Reject Executory Contracts, all of which were granted by the Court, after notice and hearing, to wit:

(a)  K. Veryl Frye, M.D., filed November 8 and granted/approved/ authorized December 8, 2006;

(b)  Joseph Basile, M.D., filed November 8 and granted/approved/ authorized December 8, 2006;

(c)  Feizol Zauhir, M.D., filed December 20, 2006 and granted/ approved/authorized December 22, 2006;

(d)  Bernard DiGiacobbe, M.D., filed February 18, 2008 and granted/approved/authorized March 10, 2008.

The Debtor continues to evaluate all of its contracts, and may, prior to the "Effective Date" of the Plan, seek to reject additional contracts.

General Electric, which was financing certain equipment, filed, on December 9, 2006 a Motion To Compel Tyrone To Accept Or Reject Its Executory Contract. Tyrone, however, since the commencement of the case, had remained current upon all payments due GE. Tyrone opposed the Motion, as assuming the contract would have elevated the status of any deficiency, in the event the Debtor could not develop and have confirmed a Plan of Reorganization and the case was converted, from a general unsecured claim to an administrative claim.

The parties, after negotiation, agreed to a Stipulation that found that Tyrone was not in default under its GE Leases and was current upon the same, and that it would remain current until it determined whether to assume or reject said leases, and the Court ruled upon the same. The Court, by Order of February 1, 2007, approved the Stipulation and Tyrone has remained current upon its lease obligations to GE.

Certain health care claims for employees of Tyrone for pre-petition health care had not been processed by the third party administrator as of the date of the commencement of the case. These were presented for payment subsequent to the commencement of the case, however, they could not be paid due to their pre-petition nature, thus exposing the employees to potential liability to the provider. The Debtor sought Court permission to make payment of these amounts post-petition, and the Court, after notice and hearing, authorized the same.

The UST elected to contest the Motion To Authorize The Appointment of James R. Walsh as Counsel To Debtor. It asserted that there was at least the appearance of a conflict of interest as Walsh's law firm was representing one or more co-defendants in the que tam action. Walsh filed responses stating there was no actual or apparent conflict, as the interests of all of the Defendants in the action were the same, and they were presenting a unified defense.

At the direction of the Court, the UST, Walsh and counsel for the Committee met and conferred, and the matter was resolved by an agreement that the Committee and its counsel would make the decisions regarding the Debtor's actions in the defense or settlement of the que tam action, and the Court approved said agreement.

The Debtor also realized that it needed to seek expert advice as to its options regarding its pension plan. It therefore sought authority to retain Cowden Associates, Inc., who are consultants and actuaries, to provide it with the needed information, options and recommendations. The Court authorized its retention by Order of April 5, 2007.

Cowden, by opinion and report dated July 6, 2007, calculated that continuing the existing pension plan would require minimum contributions to the plan for 2006 of $853,000, 2007 of $777,000, 2008 of $415,000, 2009 of $332,000, and 2010 of $294,000. It further presented an analysis of the Debtor's ability to freeze and terminate the plan, having the PBGC become the Trustee of the plan, thereby protecting the plan assets and assuring all plan participants that, as a result of the existing plan assets and the insurance provided by the PBGC that was paid for by Tyrone through the years, each participant would receive all amounts due them pursuant to the terms of the existing plan upon retirement that had accrued as of the date of freeze/termination. [1]

The Debtor identified a piece of surplus equipment, an ultrasound machine, that it no longer needed. It exposed the same to sale and generated $6,000 from its sale, which sale was approved and authorized by the Court.

In December of 2007, the Debtor sought Court authority to acquire and purchase an up to date state of the art radiology system k/a a Picture And Archiving Communication System ("PACS"), which request was supported by the Committee, would allow for the providing of additional radiologic services and allow for higher quality views to be provided to treating physicians. This request was approved by the Court after notice and hearing by Order dated January 10, 2008.

The propriety of the acquisition of the PACS System and the hope it would attract additional physicians played out and came to fruition shortly thereafter when Tyrone was able to recruit a new radiology group to meet its radiology needs, Sylvan Radiology Associates, Inc. ("Sylvan"). The Motion To Authorize Entry Into Executory Contract To Provide Radiology Services With Sylvan Radiology Associates, Inc was filed February 18, 2008, with the support of the Committee. The Court, after notice and hearing, approved the Motion via its Order of March 10, 2008, and the relationship has worked well for all involved.

---

1 This action would be done in conjunction with the Reorganized Debtor adopting a new retirement plan for the post-confirmation period, which would be in the nature of a defined contribution plan, thereby precluding underfunding from occurring.

To continue the diversification of the health care services provided by Tyrone, Tyrone filed a Motion For Authority And Approval To Construct Older Adult And Geriatric Outpatient Behavioral Health Unit And To Commence Older Adult And Geriatric Outpatient Behavioral Health Program And In Conjunction Therewith To Enter Into Management Contract For Program. This Motion was filed April 26, 2009, and was supported by the Committee. The Court approved the Motion by its Order of June 5, 2009.

The need to continue to maintain technology capacity and Tyrone's dedication to so do is further evidenced by the decision to upgrade and improve Tyrone's scanning modality abilities through the acquisition of a 16 slice CT Scanner, a portion of which was paid for with a $247,000 grant from Health Resources And Services Administration. The request was supported by the Committee, and the Court authorized and approved the acquisition of the Scanner and the financing of its cost to the extent the same was not covered by the HRSA grant by its Order dated November 9, 2009.

Simultaneously with the filing of said Motion, and as evidence of the ability of the acquisition of such technology having a positive effect upon the ability to attract physician's to utilize Tyrone's facilities in their practice, Tyrone on October 15, 2009 filed a Motion To Approve Entry Into Executory Contract To Provide Orthopedic Health Care Services With University Orthopedic Center, Ltd. After clarification of its terms, the Committee endorsed the proposed action, and the Court authorized and approved entry into the contract by its Order dated November 12, 2009.

Tyrone provides a self-funded health care plan for its employees. An employee's spouse was the recipient of plan benefits as the result of injuries alleged to occurred when a pallet of merchandise fell on him while he was shopping at Wal-Mart. Tyrone provided at least $159,000 to $166,800 of benefits to the injured individual, and became the holder of a subrogation claim against any recovery that the injured individual might receive from Wal-Mart.

On the eve of trial, Wal-Mart made a settlement offer of $250,000. After allowance of counsel's contingent fee and costs, $140,295.76 would remain available, which, if Tyrone would not compromise its claim, would result in the claimant(s) not receiving any proceeds from the suit, thereby taking away their inducement to co-operate and pursue the claim.

After negotiation, it was proposed that Tyrone agreed to limit its claim against the proceeds of the suit to $75,000. The Debtor filed a Motion for approval of the settlement which was approved by the Committee, and the Court, by its Order of July 10, 2008, authorized and approved the settlement, which was consummated.

The Debtor also was involved in a series of pieces of litigation involving the estate of Helen Kelly, deceased. Prior to the commencement of this case, the decedent's estate had commenced a state court action asserting that the decedent was injured in a fall while an in-patient at Tyrone. Tyrone disputed liability and the damages being claimed.

Upon the commencement of this case, the Debtor filed an Objection

To The Proof Of Claim filed by the Decedent's Estate. The Estate filed a Motion For relief From The Automatic Stay, seeking leave to proceed to determine liability and damages in state court. After argument, the Court, by its Order of February 25, 2008, granted the Estate leave to proceed in state court to seek a determination whether Tyrone had liability and if so, to determine the damages due.

As the result of a change in the structure of Tyrone's malpractice coverage, the initial $150,000 (including defense costs) was in essence self-insured. The Plaintiff, realizing any award against Tyrone would bring little return, thereafter filed an additional state court action against a Tyrone employee and others, including the carrier, alleging a civil conspiracy to change the coverage (a portion of which involved the releasing of a letter of credit that may have provided coverage for the self-insured portion).

The Debtor sought an Order staying the action against the employee, as the result of the Debtor's obligation, under its bylaws, to provide a defense and to indemnify her, asserting that the action was in effect an action against Tyrone subject to Section 362's stay. This position was not accepted by the Bankruptcy Court, which refused to invoke the stay, and the matter was allowed to proceed in state court.

The state court then determined that Tyrone was an indispensible party, and required that Tyrone be joined as an additional defendant in the state court action.

Thankfully, the state court thereafter issued a decision dismissing substantially all of the claims in the suit. Thereafter, the parties (without the involvement of or any contribution from the employee or Tyrone) settled their dispute and the matter has now been fully and finally concluded.

Tyrone also objected to other claims that it disputed.

The Debtor objected to claim # 99 of Jonathan Young, a minor child, acting by and through his mother and natural guardian, Rhonda Young. The Proof of Claim asserted a claim for unspecified injuries and unspecified damages. The Debtor's risk management department was not aware of any claim. Accordingly an Objection To Proof Of Claim was filed, and no response was forthcoming. The Court entered an Order disallowing the claim, but accorded the claimant 15 days to seek reconsideration. Notice of the entry of the Order and the right to seek reconsideration was provided to the claimant, and no action was taken seeking reconsideration. This claim was therefore disallowed.

The Pension Benefit Guaranty Corporation ("PBGC") filed 3 separate claims in this case.

The PBGC heretofore filed, at Claim # 84, a claim in the amount of $3,331,395.00. The PBGC has asserted, in its Proof of Claim, that the amounts due upon the claim(s) asserted in Claim 84 were allowable as administrative claims under Section 507(a)(1). The PBGC has also asserted, in its Proof of Claim, in the alternative, that the amounts due, if any, upon the claim(s) asserted in Claim 84 were allowable as general unsecured claims entitled to priority as "tax claims" under Section 507(a)(8). The PBGC also asserted, in the alternative, that the amounts due, if any, upon the claim(s) asserted in Claim 84 were

allowable as secured tax claims secured by tax liens.

The Debtor disputed the asserted claims and the assertion of entitlement to administrative, priority and/or secured status for the following reasons, to wit:

(a)  the records of the Debtor and the calculations of the Debtor's consultant Cowden Associates, Inc. indicate that the amounts due and owing for the claims asserted did not exceed $2,339,000.00;

(b)  the claims for the amounts at issue all accrued prior to the commencement of this case, and as such, were not entitled to allowance as administrative claims under and pursuant to Section 501 of the Code;

(c)  the claims of the PBGC were claims arising from the underfunding of a Defined Benefit Pension Plan, for which the Debtor has paid the PBGC the required insurance premiums to insure the benefits due Plan participants were paid even if the Debtor as Plan Sponsor itself failed to fully fund the Plan, not from the non-payment of a tax liability, and as such, said liability is not entitled to priority status under Section 507(a)(8);

(d)  the claims of the PBGC were not secured claims secured by statutory tax liens, the claims of the PBGC were claims arising from the underfunding of a Defined Benefit Pension Plan, for which the Debtor had paid the PBGC the required insurance premiums to insure the benefits due Plan participants were paid even if the Debtor as Plan Sponsor itself failed to fully fund the Plan, not from the non-payment of a tax liability, and as such, said claims, to the extent allowable, were not entitled to allowance as secured claims; and

(e)  to the extent, if any, the claims asserted at claim # 84 were determined to be allowable, the same were entitled to allowance only as general unsecured claims not entitled to priority.

In addition, the PBGC heretofore filed, at Claim # 85, a claim in the amount of $1,097,613.00. The PBGC asserted in its Proof of Claim, that $833,993.00 of the amounts due, if any, upon the claim(s) asserted in Claim 85 were allowable as administrative claims under Section 507(a)(1). In the alternative, it asserted that $833,993.00 of the amounts due, if any, upon the claim(s) asserted in Claim 85 were allowable as general unsecured claims entitled to priority as "tax claims" under Section 507(a)(8). It also asserted in the alternative that $288,029.00 of the amounts due, if any, upon the claim(s) asserted in Claim 85 were allowable as administrative claims under Section 507(a)(1). It also alleged, in the alternative, that $545,964.00 of the amounts due upon the claim(s) asserted in Claim 85 were entitled to allowance as priority claims under Section 507(a)(5). Or that the same were entitled to allowance as priority claims under Section 507(a)(8).

The Debtor disputed the asserted claims and the assertion of entitlement to administrative and/or priority status for the following

reasons, to wit:

    (a)    the records of the Debtor and the calculations of the Debtor's consultant Cowden Associates, Inc. indicated that the amounts due and owing for the claims asserted did not total $1,097,613.00;

    (b)    the claims for the amounts at issue all accrued prior to the commencement of this case, and as such, were not entitled to allowance as administrative claims under and pursuant to Section 501 of the Code;

    (c)    the claims of the PBGC were claims arising from the underfunding of a Defined Benefit Pension Plan, for which the Debtor had paid the PBGC the required insurance premiums to insure the benefits due Plan participants were paid even if the Debtor as Plan Sponsor itself failed to fully fund the Plan, not from the non-payment of a tax liability, and as such, said liability was not entitled to priority status under Section 507(a)(8);

    (d)    the claims of the PBGC were not entitled to allowance as priority claims under Section 507(a)(5), as the amounts claimed due do not meet the criteria for allowance as priority claims under Section 507(a)(5);

    (e)    the claims asserted at Claim # 85 were duplicative of portions of the amounts asserted at Claim # 84; and

    (f)    to the extent, if any, the claims asserted at claim # 85 were not duplicative of the claims asserted at Claim # 84, and portions of the same were determined to be allowable, the same were entitled to allowance only as general unsecured claims not entitled to priority.

Finally, the PBGC heretofore filed, at Claim # 86, a claim for an unliquidated amount that was asserted to be for premiums due to the PBGC on the "pension insurance" that accrued prior to the commencement of this case, and the PBGC asserted that said amounts are entitled to allowance as general unsecured claims not entitled to priority. In addition, the PBGC asserted an unliquidated claim that was asserted to be for premiums due to the PBGC on the "pension insurance" that accrued subsequent to the commencement of this case, and the PBGC asserts that said amounts are entitled to allowance as administrative claims entitled to priority under Section 507(a)(1).

The Debtor agreed that, to the extent pension insurance premiums accrued and became due during the pre-petition period, that said amounts are entitled to allowance as general unsecured claims not entitled to priority, and further, agreed that, to the extent pension insurance premiums accrued and became due and owing subsequent to the commencement of this case, that said amounts were entitled to allowance as administrative claims entitled to priority under Section 507(a)(1).

After extensive discovery, the parties agreed upon settlements that were approved by the Court.

By Order dated January 10, 2008, it was agreed that

(a)    claim # 84 for unfunded benefit liabilities was allowed as a general unsecured claim not entitled to priority in an amount not to exceed $2,339,000.00 premised upon a pension plan termination date of December 31, 2007;

(b)    to the extent pension insurance premiums accrued and became due during the pre-petition period, that said amounts were entitled to allowance as general unsecured claims not entitled to priority; and

(c)    to the extent pension insurance premiums accrued and became due and owing subsequent to the commencement of this case, said amounts were entitled to allowance as administrative claims entitled to priority under Section 507(a)(1).

Thereafter, by Order dated October 27, 2008, it was agreed that the parties agree that the PBGC shall, as regards its claims asserted at Claim # 85 for minimum funding contributions due or that could have been asserted at Claim # 85 for minimum funding contributions from the beginning of time through the date of the distress termination of the Defined Benefit Pension Plan of Tyrone, to wit, December 31, 2007, be accorded an allowed Chapter 11 administrative claim entitled to priority under and pursuant to Section 507(a)(2) in the amount of $67,000, and that except for said $67,000.00 claim, all other claims of the of the PBGC for minimum funding contributions asserted or that could have been asserted at Claim # 85, including the amended amounts referred to in the Response of the PBGC to the Debtor's Objections To Claim # 85 were agreed to be withdrawn with prejudice and were disallowed in toto.

In a separate dispute between the Debtor and the PBGC, the Debtor sought a determination by the Court that it was entitled to a distress termination of its defined benefit pension plan. The PBGC disputed the Debtor's entitlement to a distress termination.

After extensive discovery, on the eve of trial, the PBGC agreed that the Debtor was entitled to a distress termination and the Court, by its Order of October 27, 2008, determined Tyrone would be unable to pay its debts and continue in business outside of Chapter 11 unless the pension plan was terminated and therefore the Court approved the termination of the debtor's pension plan under 29 U.S.C. Section 13341 (c)(2)(B)(ii)(IV)(2000).

The pension plan therefore was terminated effective and retroactive to December 31, 2007.

The Debtor also commenced an adversary proceeding against Quorum Health Resources, LLC ("Quorum"). The complaint alleged that Quorum was the recipient of a payment within the 90 day period preceding the commencement of this case in the amount of $315,000.00 that was avoidable pursuant to Section 547 of the Code as a preferential transfer. Quorum disputed liability.

After discovery, the parties entered into a settlement, subject to Court approval, in which Quorum, while not admitting liability, agreed to pay the estate the sum of $200,000. The Court approved the settlement and the required sums were paid as agreed.

As was discussed supra, the Debtor also objected to three related claims.

Kimberly Gummo ("Gummo") and Thomas Bartlett ("Bartlett"), individually and as Relators previously filed a Civil Action on behalf of themselves and the United States, asserting in the United States District Court For The Western District of Pennsylvania. Said action was filed to 04- 57 J.

The action of the U.S., filed under the False Claims Act, alleges that the Debtor, in concert with the other named defendants, many of whom were physicians on the staff of Tyrone, engaged in activities that were prohibited under the Stark Law and its related regulations through the physician's having an ownership interest in an entity that provided modality services, and that said ownership interest resulted in prohibited self-referrals. The action sought damages for false claims allegedly submitted in the amount of $4,020,000, claims for treble damages under 31 U.S.C. Section 3729 in the amount $12,060,000, claims for civil penalties under 31 U.S.C. Section 3729(a), in the amount of $58,960,000, and counsel fees and costs. The District Court heretofore dismissed the Complaint, with leave to the Plaintiff's to file an Amended Complain, which has occurred. A Motion To Dismiss has been and remains pending before the District Court.

The United States has elected not to take control of the matter, and the individuals, Gummo and Bartlett, as Relators, are pursuing the case and, subject to the provisions of the statute, are in control of the litigation.

The claims reflected in said Complaint on behalf of the United States were reflected in Claim # 88, to which the Debtor objected.

Bartlett, in the said District Court action, also asserted claims on his own behalf, claiming that the Debtor engaged in retaliation, employment discrimination and other prohibited acts against him for "whistle blowing" that resulted in lost wages. He alleges lost wages from December 1, 2003 through September 20, 2006 in the amount of $450,000, double damages pursuant to 31 U.S.C. Section 3730(h) in the amount of $900,000, a credit for amounts earned of $210,000, and counsel fees and costs, for estimated claims of $690,000.

The claims of Bartlett reflected in the said Complaint were reflected in Claim # 89, to which the Debtor objected.

Gummo, in the said District Court action, also asserted claims on her own behalf, claiming that the Debtor engaged in retaliation, employment discrimination and other prohibited acts against her for "whistle blowing" that resulted in lost wages. She alleges lost wages from August of 2004 through September 30, 2006 in the amount of $135,000, double damages pursuant to 31 U.S.C. Section 3730(h) in the amount of $270,000, a credit for amounts earned of $135,000, and counsel fees and costs, for estimated claims of $135,000.

The claims of Gummo reflected in the said Complaint were reflected in Claim # 90, to which the Debtor objected.

After extensive negotiation, and on the part of the Debtor a consideration of the costs to it in real $1.00 on the $1.00 for defense costs, a settlement of the claims asserted at Claims # 88, 89

and 90 was agreed to between the Debtor, Bartlett and Gummo, subject to the approval of the District Court and the U.S. as required by 31 U.S.C. Section 3730(b)(1), which provided, inter alia:

(a)  Bartlett, for voting purposes, shall be accorded a general unsecured claim not entitled to priority, in the amount of $690,000, for which he would receive, on the Effective Date of the Plan, a one time lump sum payment of $50,000;

(b)  Gummo, for voting purposes, shall be accorded a general unsecured claim not entitled to priority, in the amount of $135,000, for which she would receive, on the Effective Date of the Plan, a one time lump sum payment of $25,000; and

(c)  The Relator Claims and Qui Tam Actions on behalf of the United States against the Debtor and a now defunct affiliate, Tyrone Medical Associates, Inc. would be withdrawn and dismissed with prejudice, for which the United States would receive, on the Effective Date of the Plan, a one time lump sum payment of $25,000.

The Bankruptcy Court, after notice and hearing, entered an Order dated December 1, 2008 approving and confirming said settlement(s) in accord with their terms.

Thereafter, the parties were advised that the United States, despite not electing to take control of the matter, leaving the individuals, Gummo and Bartlett, as Relators, to pursue the case and, subject to the provisions of the statute, in control of the litigation, would not consent to the settlement, because it not be receiving any payment whatsoever, whereas Bartlett would be receiving $50,000 and Gummo would be receiving $25,000.

To attempt to address this concern, the Debtor has offered to make a one time lump sum payment to the United States of $75,000, in return for the withdrawal and dismissal of the False Claims action and Qui Tam actions with prejudice as to the Debtor and Tyrone Medical Associates, Inc. Approval of the revised settlement offer has been, the Debtor is advised, is pending and will then be submitted to the Bankruptcy Court for approval.

Should a required approval not be forthcoming and prove fatal to the confirmation of the Plan outlined below, such lack of approval could very well have the effect of causing Tyrone to close and the residents of the Tyrone area to loose their ability to receive community health care in a hospital within their community of residence and to travel to State College (approximately 29 miles) or to Altoona (approximately 20 miles) for hospitalization and outpatient services. It will also deprive the United States of receiving the repayment of amounts due for past-Medicare overpayments that will result under the Plan from the assumption of the Medicare Provider Agreement that had been entered into between the United States Department of Health And Human Services and Tyrone prior to the commencement of this case. Said overpayments, which have been agreed to be repaid over a 5 year period, (and after credit for payments made through March 3, 2010), totals $520,696.00. If Tyrone is compelled to close because of an inability to obtain confirmation of its Plan set forth below, the remaining portion of the overpayment will not be able to be made, and in fact HHS may be compelled to disgorge the portion

of the $195,723.00 repaid as of March 3, 2010 that may be attributable to the pre-petition period.

In addition, if Tyrone's Plan is not confirmed, and Tyrone is compelled to close, since the Debtor would not be operating after Confirmation, it would not pay the "Special Rule" post-effective date payments that will become due to the PBGC as the result of the distress termination of the defined benefit pension that was effective December 31, 2007 of $1,250 per Plan Participant as of the "Effective Date" for the three (3) years following the "Effective Date" of a confirmed plan pursuant to 29 U.S.C. Section 1306(a)(7).[2]

Finally, in addition to the lost employment opportunities for what is already a high unemployment area, the amounts provided for under the Plan for the holders of allowed pre-petition general unsecured claims not entitled to priority would not be made.

In addition, HHS made a determination that there were Medicare overpayments that are required to be repaid to HHS. These amounts consist of amounts due for the Cost Report Year ending July 31, 2004 (letter dated Dec. 17, 2008) in the amount of $10,968.00; June 30, 2002 (letter dated Dec. 22, 2008) in the amount of $9,894.00; June 30, 2006 (letter dated Nov. 12, 2007) in the amount of $284,637.00; June 30, 2007 (letter dated Aug. 8, 2007) in the amount of $222,934.00 adjusted for a credit due Tyrone (letter dated November 18, 2008) in the amount of $24,600.00; June 30, 2008 (letter dated Nov. 17, 2008) in the amount of $5,550.00; June 30, 2008 (letter dated Nov. 17, 2008) in the amount of $9,803.00; June 30, 2008 (letter dated Oct. 8, 2009) in the amount of $60,689.00; June 30, 2009 (letter dated February 13, 2010) in the amount of $145,268.00; and June 30, 2009 (letter dated February 13, 2009) in the amount of $1,376.00, for an aggregate amount of $716,419.00.

For a period from June 30, 2009 through August 17, 2009, HHS recouped $120,225.00 of June 30, 2009 overpayments by withholding 20% of the amounts due Tyrone in Medicare payments, while the parties were negotiating regarding the 5 year extended repayment schedule. For November of 2009 through March of 2010, monthly payments of $11,075.00 were made to HHS. In addition, a credit of $20,123.00 was applied against the overpayment pursuant to a letter of February 24, 2010, resulting in repayment of $195,723.00 as of March 3, 2010, leaving a balance due of $520,696.00, which is being repaid at $11,095.00 per month.

These above efforts of contract adjustments and program development have shown concrete results to date.

Despite the losses reflected and discussed in the pre-petition period, the losses for 2007 were dramatically reduced. The losses for fiscal 2007 were reduced to only ($587,013.00), including depreciation, thereby demonstrating, it is submitted, the efforts of Tyrone to improve performance.

For the year ending December 31, 2008, the losses were reduced to only ($403,957.00). For the Fiscal Year ending June 30, 2009, the

---

2 This annual payment to the P.B.G.C. will, since there were 255 Plan Participants as of December 31, 2007, be $318,750 per annum for the 3 year period subsequent to Confirmation Of A Plan of Reorganization and the passage of the Effective Date, for a total payment to the PBGC over the 3 year period of $956,250.00.

losses were reduced to ($206,750.25).

For July of 2009, the year to date loss was ($133,651). The year to date status as of August 31, 2009 totaled a negative ($335,216). The performance through September 30, 2009 showed a year to date loss of ($165,013). Through October 31, 2009, the year to date loss totaled ($134,672). For the period through November 30, 2009, the year to date loss totaled ($176,953). Through the period ending December 31, 2009, the debtor's performance showing a negative return of $207,380. By the end of January, 2010, the last period for which the MOR has been completed, the year to date income was ($215,748).

In addition to the above, it is believed that creditors should be aware of the efforts that Tyrone has expended since the filing in seeking an affiliation with a larger hospital or System.

Recognizing the problems facing smaller independent community hospitals in this era and in this state, the management of Tyrone determined to pursue an affiliation with another and bigger hospital or System, to obtain the efficiencies and synergies of such a relationship, including buying discounts due to volume, billing efficiencies due to volume, sharing physician time for specialists that are not currently in the Tyrone area which would result in increased admissions and utilization of services, and improved managed care contracts. After much consideration, it was determined that most logical "suitor" would be Altoona Hospital ("Altoona"), which is a tertiary facility about 20 miles from Tyrone.

Altoona initially expressed optimism that an affiliation of some kind would be in the mutual interests of both parties. Extensive discussions between the parties ensued, and Altoona went so far as to retain, at its cost, appraisers and a consultant to review the options and alternatives, the costs involved, and the revenue to be derived from any changes made. As reflected in a press release from Altoona, these discussions progressed to discussions with Altoona and an Orthopedic Group entering into a Joint Venture making the Tyrone facility a specialty hospital focusing upon Orthopedics, while continuing to function as a community hospital with an Emergency Department and ICU.

While all parties were optimistic that the relationship could be consummated, unfortunately, the Orthopedic Group elected not to proceed forward, and the possibility of a current affiliation with Altoona passed.

Tyrone has also, in this period, sought interest from other nearby health care providers, to determine their interest, however, again, nothing of substance has developed to date.

Finally, at least one party has contacted the Committee expressing an interest in reviewing the facilities. Tyrone management made itself available on at least 4 occasions to meet with the potential party with an interest, however, on each occasion the party cancelled the meeting.

Finally, top management at Tyrone has changed due to retirements and decisions to move on to pursue other endeavors.

The CEO of Tyrone at the time of the commencement of the has

retired. The Board has appointed Steve Gildea, who had been the CIO, as CEO. Similarly, the CFO at the time of the commencement of the case has left to pursue other endeavors, and Michael Zenone has been appointed as CFO.

As such, Tyrone, which is, as noted supra, committed to continuing to provide community hospital based care to Tyrone and the surrounding communities, has developed the within Plan of March 1 2010, which is outlined infra.

No additional matters of significance have occurred to date.

A. Summary of Assets, Debts and Liabilities
As Of Commencement of Case

As of the commencement of the case, the known assets of the Debtor consisted, inter alia, of the following assets, specifically:

| ASSET | INTEREST VALUE |
|---|---|
| Five buildings (including main hospital Building) situated on 13.75 acres located At 1 Hospital Drive, Tyrone, Pa. (It is noted that a portion of this tract was transferred by a grantor that included a reverter in the event the tract ceases being used for hospital purposes | $1,250,000.00 |
| petty cash | $450.00 |
| operating account 11007885 at Omega | $127,267.71 |
| payroll account 110007893 at Omega | $14,589.90 |
| savings account 15410518 at Omega | $8,206.64 |
| Bioterrorism Grant Cash Savings Account 15410534 at Omega | $37,169.73 3 |
| Bioterrorism Grant Cash Savings Account 15410623 at Omega | $16.45 |
| Operating Account 9839884831 at M&T | $820,017.94 |
| 2006 Grant Cash Savings, I.T. Grant Account 0011007907 at Omega | $221,678.51 4 |
| Investment account at Omega 60008578302 | $1,045,121.56 |
| UBS Financial Services Account VW0891652 | $12,447.92 |

Patient Accounts Receivable net of

---

3 These funds are not property of the estate. They are the proceeds of a Federal Grant that are limited to funding Bioterrorism related improvements provided for under the Grant. **In Re West Electronics, Inc.**, 852 F.2d 79 at 83 (3rd Circ., 1988)

4 Same as 2, only for I.T.

Contractual allowances and bad debt allowance        $2,031,979.00

Loans to TMA over past 8 years of
Approximately $400,000 per year, considered
Uncollectible                                                $0.00

1994 Ford F250 with 85,710 miles                         $3,875.00

2002 Chevrolet Adventure Van with 76,445 miles          $6,205.00

Assorted used office furniture (listing in
Amended Schedules B)                                    $42,560.61

Assorted Equipment (listing in Amended Schedule B) $181,628.34

Other Equipment (listing in Amended Schedule B)    $41,528.18

Medical Equipment (listing in Amended Schedule B) $417,111.16

Drug Inventory                                          $95,723.00

Medical/Surgical Supplies                              $117,967.00

Pre-paid expenses                                      $327,333.00

Beneficial Interest/Remainder Trust Helen
Riddle and John Funk Trust                             $343,745.00 5

Tyrone Hospital Endowment Fund                         $543,909.00 6


        **YOU ARE ADVISED THAT THE VALUATIONS PLACED ON THE ASSETS OF THE
DEBTOR AT THE TIME OF THE COMMENCEMENT OF THE CASE ARE THE VALUES OF
THE ASSETS IN THE OPINION OF THE DEBTOR'S MANAGEMENT, BASED UPON HIS
FAMILIARITY WITH THE ASSETS AND THEIR COSTS, AS WELL AS THEIR SALE
VALUE, SUPPLEMENTED BY AN APPRAISAL PERFORMED APPROXIMATELY 2 YEARS
BEFORE THE COMMENCEMENT OF THE CASE.**

        **TO THE EXTENT ANY CREDITOR BELIEVES THAT KNOWLEDGE OF THE FAIR
MARKET VALUE OF THE ASSETS AS OF THE COMMENCEMENT OF THE CASE IS
REQUIRED FOR HIS/HER/ITS EVALUATION OF THE PLAN, AND HIS/HER/ITS
VOTING THEREON, HE/SHE/IT SHOULD AND MAY OBTAIN AN INDEPENDENT
APPRAISAL OF THE ASSETS AT ISSUE AT HIS/HER/ITS COST.**

The debts against the Debtors were:

(A) Secured Claims-

        Omega Bank, line of credit, secured by an assignment/
        Security interest in and to the Investment Account with a balance
        of $1,045,121.56, having a balance due as of the commencement of
        the case of $524,999.00;

        Omega Bank, term loan, secured by an assignment/
        Security interest in and to the Investment Account with a balance

---

5 Same as 2, only for improvements to hospital.

6 Same as 2, only for improvements to hospital.

of $1,045,121.56, having a balance due as of the commencement of the case of $286,850.70;

(B) Executory Contracts-

The Debtor is a party to numerous executory contracts, some of which, as noted supra, have already been rejected. These include:

| | |
|---|---|
| Adara Healthcare Staffing, Inc. | personnel staffing agreement dated 2/1/05 |
| Basil Seldon, M.D. | Independent Contractor Agreement Dated 10/13/02, expiring 10/12/07 |
| Baxter Capital Services | PCA pumps lease dated 5/2/05, expires 5/2/2010 |
| Bernard DiGiacobbe, M.D. | Radiology Agreement dated 6/28/84, expiring 6/28/07 |
| Carolyn Updyke | Employment contract dated 6/10/00, amended 3/1/05, expires 2/28/07 |
| Central Anesthesia | Anesthesia services agreement dated 1/1/05, expires 12/31/09 |
| David Faye | vascular ultrasound service agreement dated 1/1/06, expires 12/31/08 |
| Debra Muri | Employment contract dated 7/31/00, expires 9/30/08 |
| GE Healthcare Financial Services | CT Scanner, 60 month lease dated 11/2002 |
| GE Healthcare Financial Services | Anesthesia Machine, 60 month lease dated10/2005 |
| GE Healthcare Financial Services | bone densitometer, 60 month lease dated 8/2003 |
| Great America Leasing | copiers, 60 month leases dated 2/2004 |
| HPSC | YAG Laser, 60 month lease dated 2/2003 |
| Jennifer Leamer | Vascular Ultrasound Services Agreement dated 1/1/06 expiring 12/31/08 |
| Johnston Realty, Inc. | lease for Office space at 2032 E. Pleasant Valley Blvd, expires 11/2006 |
| Manifest Funding Services | C-Arm, 60 month lease dated 6/2004 |
| Metz & Associates | Service Agreement dated 4/1/04, expires 4/1/07 |

| Olympus America, Inc. | Ridged Scopes lease dated 12/2003, expires 12/2006 |
| Pharm-Assist, Inc. | Professional Services Agreement dated 9/19/05, expires 9/30/06 |
| Pradeep Swain, M.D. | Independent Contractor Agreement dated 10/17/05, expires 7/31/07 |
| Pro-Care Health Systems, Inc. | Rehabilitive Services Agreement dated 8/1/05, expires 7/31/07 |
| Thomas Baumgarten, M.D. | Independent Contractor Agreement dated 10/13/02, expires 10/12/07 |
| Veryl Frye, M.D. | Independent Contractor Agreement dated 10/13/02 |

(C) Priority Claims-

At the time of the commencement of this case, the known priority claims were:

| Family Division | child support payments | $193.38 |
| Blair County Tax Claim Bureau | real estate taxes | $22,643.68 |
| Pa. U.C. Fund | payroll taxes | $772.92 |
| Pennsylvania SCDU | payroll taxes | $193.38 |
| Tyrone Area S.D. | payroll taxes | $16,421.29 |

(D) General Unsecured Claim-

At the time of the commencement of this case, the Debtor scheduled 250 creditors, with scheduled claims of $1,353,322.30 in claims.

The dollar value did not include the claims related to the Pension Plan related to underfunding, as the decision had not been made as to whether said Plan would remain in effect or be terminated.

The dollar value further did not include the claim of National City Bank as trustee under an irrevocable trust for a minor child, due to said claim being confidential. The claim has since been asserted publicly by the Trustee, is undisputed, and is in the amount of $2,250,000.00.

The quantification also did not include the dollar amount of asserted claims that are unliquidated, contingent and disputed, including the que tam claim which asserts a valuation of $7,100,000.00; a claim alleging employment discrimination based upon retaliation by Thomas Bartlett, alleging a claim of $6,900,000.00; and a claim alleging employment discrimination based upon retaliation by

Kimberly Gummo, alleging a claim of $1,100,000.00.

They further do not include dollars values for the unliquidated, contingent and disputed claims of plaintiffs in personal injury cases alleging malpractice where Tyrone disputes and denies any liability.

## B. Significant Post-Petition Events

The purpose of this section of the Disclosure Statement is to apprise the claim holders of significant post-petition events that affect the present status of the case and potentially could affect the vote of a claim holder on the Plan.

Exclusive of the proceedings discussed supra, no additional matters have occurred that the Debtor believes would affect the status of this case.

## C. Status of Assets and Liabilities as of Drafting Date of Plan, March 1, 2010

(1) Liabilities

(a) Undisputed Claims

As set forth above, the time "bar date" for the filing of claims has passed, and the Debtor has and is in the process of examining and analyzing the claims filed and/or deemed filed. Where appropriate in the opinion of the Debtor and its counsel, and after consultation with the Committee and its counsel, objections have been or will be filed to claims that are disputed, contingent, or unliquidated.

(A)   Secured claims:

The secured claims identified above remain as of this date, however, the amounts due have been, due to adequate protection and other payments made, reduced on the term loan.

In addition, the claims for real estate taxes have been asserted, properly, as secured claims, the security being statutory liens against the Debtor's real estate. Another year of taxes have likewise accrued.

(B) Executory Contracts:

With the exception of the contracts that were rejected, no material changes have occurred, and the vast majority of the leases that would have expired had renewal clauses, and the Debtor uses and continues to use the equipment, with the exception of the purchase of the 16 slice CT (a portion of which was funded by a federal grant), the entry into Radiology Services Agreement with Sylvan Radiology, the entry into the Geriatric Services Agreement, and the entry into the Orthopedic Services Agreement.

(C) Priority Claims For Taxing Bodies Entitled To Priority Under Section 507(a)(8):

With the exception of the assertion of a claim by the Dept. of Revenue for $544.41, no change has occurred in the undisputed priority

claim status.

The PBGC had asserted several claims, anticipating the termination of the pension plan. Its claims were resolved as outlined and discussed supra.

(D) General Unsecured Claims Not Entitled To Priority That Were Timely Filed Or Are Deemed To Have Been Timely Filed And Are Not Disputed At This Juncture-

The claims asserted in this category, as amended by scheduled claims that were not disputed, total $3,603,000.00, not including the claims relating to the termination of the pension plan, which were resolved as set forth supra, leaving, without referencing the qui tam claims, claims totaling $5,704,688.

(E) Disputed Unsecured Claims-

The quantification also did not include the dollar amount of asserted claims that are unliquidated, contingent and disputed, including the que tam claim which asserts a valuation of $7,100,000.00; a claim alleging employment discrimination based upon retaliation by Thomas Bartlett, alleging a claim of $6,900,000.00; and a claim alleging employment discrimination based upon retaliation by Kimberly Gummo, alleging a claim of $1,100,000.00. The individual claims of Bartlett and Gummo were settled as set forth supra, subject to the resolution of the Qui Tam and False Claims Act claims of the U.S., which were discussed supra.

(2) Assets

The asset picture of the estate, at present, is relatively straightforward, and is, except for changes resulting from depreciation, or converting receivables to cash and then creating more receivables for services rendered, virtually unchanged.

**YOU ARE ADVISED THAT THE VALUATIONS PLACED ON THE ASSETS OF THE DEBTOR AT THIS TIME ARE THE VALUES OF THE ASSETS IN THE OPINION OF THE DEBTOR'S MANAGEMENT, BASED UPON THEIR FAMILIARITY WITH THE ASSETS AND THEIR COSTS, AS WELL AS THEIR REPLACEMENT VALUE, SUPPLEMENTED BY AN APPRAISAL PERFORMED APPROXIMATELY 5 YEARS AGO.**

**TO THE EXTENT ANY CREDITOR BELIEVES THAT KNOWLEDGE OF THE FAIR MARKET VALUE OF THE ASSETS IS REQUIRED FOR HIS/HER/ITS EVALUATION OF THE PLAN, AND HIS/HER/ITS VOTING THEREON, HE/SHE/IT SHOULD AND MAY OBTAIN AN INDEPENDENT APPRAISAL OF THE ASSETS AT ISSUE AT HIS/HER/ITS COST.**

## V.  SUMMARY OF PLAN OF REORGANIZATION
### DATED MARCH 1, 2010

The Plan of Reorganization of the Debtor, as set forth below, is a Plan where the Debtor utilizes the cash flow from operations to fund its Plan, thereby allowing the Debtor to continue operations and meet the needs of the community and the Code as to its creditors, as well as to make certain lump sum payments for the benefit of the holders of allowed general unsecured claims not entitled to priority, one of the claims of First National Bank, f/k/a Omega Bank, and its

administrative and priority claims.

The treatment being provided to the various classes parallels the treatment that the claims would receive in a Chapter 7 case.

The claims have been classified according to their nature, as permitted by Section 1122 of the Code, however the classification and treatment is parallel to the treatment the same would receive in a Chapter 7 case

1. CLASS 1- Class 1 shall be the allowed secured claims of the Blair County Tax Claim Bureau, for unpaid real estate taxes for the pre-confirmation and post-confirmation periods. Said claims are secured by statutory liens against the realty that was the subject of the tax.

2. CLASS 2- Class 2 is the allowed secured claim of First National Bank, f/k/a Omega Bank, upon the line of credit. It is secured by an assignment/security interest in the Investment Account and its progeny at FNB/Omega. The balance due at the time of the commencement of the case was $524,999.00.

3. CLASS 3- Class 3 is the allowed secured claim of Omega Bank upon its term loan. It is secured by an assignment/security interest in the Investment Account at Omega. The balance due at the time of the commencement of the case was $286,850.00.

4. CLASS 4- Class 4 are the allowed secured claims of parties that entered into documents captioned "Leases" but that are actually installment sales holding as collateral security interests in the personalty that as the subject of the "Lease".

5. CLASS 5- Class 5 consists of the administrative claims allowable as Section 503(b)(1) claims, excluding professional fees to professionals retained by the Debtor-In-Possession and/or the Committee with Court approval, as well as the allowed administrative claims of the Department of Health And Human Services for Medicare Overpayments, and the allowed administrative claim of the PBGC pursuant to the approved settlements regarding its claims.

6. CLASS 6 - Class 6 consists of the administrative expenses under Section 503 of the Code to professionals, specifically James R. Walsh, Esq., Debtor's counsel, Cowden Associates, Debtor's Pension Consultant, George Snyder, Esquire, of Stonecipher, Cunningham, Beard & Schmitt, Committee counsel, and Mark Gleason, the Committee's financial advisor, and any other such professionals hereafter retained with Court approval, to the extent the same shall be allowed by the Court, after notice and hearing as required by law.

7. Class 7 - Class 7 consists of the allowed administrative claims of the PBGC pursuant to the Court approved settlement(s) regarding its claim(s).

8. Class 8 - Class 8 consists of the agreed upon administrative claim(s) of the Department of Health & Human Services resulting from the assumption by the Debtor of the MediCare Provider contract as the resulting transformation of the pre-petition overpayments into administrative claims, as well as for the overpayments that have occurred post-petition through the Effective Date of the Plan.

9. <u>Class 9</u> - Class 9 consists of the allowed claims of the holders of assumed executory contracts, exclusive of the claims of members of Classes 6, 7 and 8.

10. <u>Class 10</u> - Class 10 consists of allowed pre-petition priority wage claims, if any, that remain due and owing as of the "Effective Date".

11. <u>Class 11</u> - Class 11 consists of the allowed pre-petition priority claims for employee benefits, if any, that remain due and owing as of the "Effective Date", other than Class 7 claims.

12. <u>Class 12</u> - Class 12 consists of the allowed priority claims for taxes that are entitled to priority under Section 507(a)(8), if any, that remain due and owing as of the "Effective Date".

13. <u>Class 13</u> - Class 13 consists of the allowed timely filed or deemed timely filed general unsecured claims not entitled to priority, exclusive of the portion of the claim of National City Bank, as Trustee, that was agreed to be subordinated ($500,000.00 of the $2,250,000.00 claim, resulting in $1,750,000.00 of the National City Bank, as Trustee, claim being included in Class 13), and the allowed claims of Classes 14 and 15.

14. <u>Class 14</u> - Class 14 consists of the portion of the claim of National City Bank, as Trustee, that was agreed to be subordinated ($500,000.00 of the $2,250,000.00 claim).

15. <u>Class 15</u> - Class 15 consists of the allowed general unsecured claims of individual claims of Bartlett and Gummo, and the claims of the United States, as being pursued by Bartlett and Gummo as Relators under the False Claims Act and Qui Tam, as reflected in the Civil proceeding filed before the District Court in Johnstown, and as reflected in the Settlement Agreement approved by the Bankruptcy Court, as modified infra as to the United States claim's under the False Claims Act and Qui Tam as to the Debtor and its defunct affiliate, Tyrone Medical Associates, Inc.

16. <u>Class 16</u> - Class 16 consists of untimely filed claims, to the extent, if any, that any are asserted and allowed.

The total amounts due Class 1 through the Effective Date shall become, as of the Effective Date, the "Adjusted Class 1 Claim." Said Adjusted Class 1 claim shall accrue interest at the rate of 4.5% per annum, and no further penalties shall accrue upon said amount. The Adjusted Class 1 claim shall be amortized over a period of seventy two (72) months, and shall remain secured by the statutory liens securing its liens. Monthly payments shall commence being made of the 15th day of the month following the month in which the Effective Date shall occur, and shall continue on or before the 15th day of each month following thereafter, without notice or demand, until the entire amount due, including accrued interest, shall be paid in full, provided, however, in the event that the balance has not theretofore been paid in full, the entire balance, including remaining principal and accrued interest shall become fully due and payable six (6) years from the date the initial payment was due.

All amounts paid shall applied first to accrued interest, then

to principal reduction.

For so long as the Reorganized Debtor is not in excess of thirty (30) days in arrear, the Class 1 claimant shall be precluded from enforcing its statutory lien. In the event the Reorganized Debtor becomes in excess of thirty (30) days in arrears, then and in such case, upon ten (10) days prior written notice to the Reorganized Debtor, and the failure of Reorganized Debtor to have cured the default, the Class 1 Claimant shall be permitted to enforce its liens as permitted by applicable law.

In the event the Reorganized Debtor and the Class 1 claimant cannot agree upon the allowed Class 1 claim, either party (the Debtor or the Class 1 claimant) may, within 90 days of the Effective Date, seek a determination of the amount(s) due Class 1, and the decision of the Court shall be final. If no such determination is sought within said period, then the Debtor's calculations as to the allowed amount of the Class 1 claims shall be determinative.

Class 2 shall, on the Effective Date, be satisfied and paid in full its principal balance and accrued interest, out of the Investment Account (or its successor accounts) assigned to and held by it as collateral.

Class 3 shall, on the Effective Date, retain its first position lien/assignment/security interest currently held against the Investment Account and its proceeds (as well as any conversions of said account into a different mode (e.g., from the investment account to a Certificate of Deposit, savings account, money market account, etc), and the obligations shall, until paid in full, accrue interest at the rate of 4.5% from the Effective Date until paid in full regardless of default, maturity, the entry of judgment, or any similar event.

The Reorganized Debtor shall execute such documents as FNB a/k/a Omega Bank, shall reasonably request to evidence the security interest and to perfect the same as required by applicable law.

Except to the extent modified herein, all other terms and conditions of the loan documents for the Class 3 claim shall remain in full force and effect, including the monthly payment.

Within not more than 30 days of the Effective Date, the Debtor/Reorganized Debtor shall file a schedule of which Class 4 obligations it intends to retain, and which Class 4 obligations it intends to terminate by surrendering the collateral, to the extent the same remains, to the secured party, which collateral surrender shall occur by the Reorganized Debtor making the collateral available for picking up by the secured party at the Debtor/Reorganized Debtor's principal place of business within not more than five (5) days from the date of the filing of the Notice, with the claimant having thirty (30) days from the date of the filing of the Notice to assert any deficiency claim that may be appropriate. The Debtor/Reorganized Debtor, and any other party in interest, including the Committee, shall have the right to object to any asserted deficiency.

A copy of the Notice shall be served upon each Class 4 claimant at its last know mailing address via certified mail, return receipt requested.

The obligations of Class 4 claimants that the Reorganized Debtor elects to retain shall remain in full force and effect, as per the terms of the obligation as entered into between the Claimant and the Debtor, and shall be unaffected by this filing.

The claims of Class 5 are being paid per the terms of the obligations as and when the same become due, and the same shall continue to be paid as such, per the terms of the post-petition incurred obligation(s).

Upon the Court's determination of the allowability of the Class 6 claims, the same shall be paid by the Reorganized Debtor, using the Reorganized Debtor's cash reserve, within not more than ten (10) days of the Order Allowing the same becoming final. The Class 6 claims are projected to be as follows, to wit, Debtor's counsel, $250,000.00, Debtor's pension advisor, $15,000.00, Committee Counsel, $125,000.00, and Committee Financial Advisor, $15,000.00. Said amounts are projections only, and could vary substantially depending upon the extent of litigation that hereafter occurs.

Upon the Effective Date of the Plan, the Debtor shall, as to the allowed Class 7 Claims, remit to the PBGC the allowed amount of its administrative claim(s) as per the terms of the settlement. As per the settlement approved by the Court Thereafter, by Order dated October 27, 2008, it was agreed and Ordered that the PBGC shall, as regards its claims asserted at Claim # 85 for minimum funding contributions due or that could have been asserted at Claim # 85 for minimum funding contributions from the beginning of time through the date of the distress termination of the Defined Benefit Pension Plan of Tyrone, to wit, December 31, 2007, be accorded an allowed Chapter 11 administrative claim entitled to priority under and pursuant to Section 507(a)(2) in the amount of $67,000, and that except for said $67,000.00 claim, all other claims of the of the PBGC for minimum funding contributions asserted or that could have been asserted at Claim # 85, including the amended amounts referred to in the Response of the PBGC to the Debtor's Objections To Claim # 85 are agreed to be withdrawn with prejudice and are disallowed in toto. Upon payment of said amount, all otherwise assertable administrative or other claims of the PBGC not provided for in the settlement shall be deemed disallowed and discharged.

As noted in the Disclosure Statement, the provisions of which are incorporated herein, the Department of HHS has asserted claims against the debtor for pre and post-petition claims as the result of the overpayment of Medicare over payments, including pre-petition claims arising from the assumption of the Medicare Provider Agreement entered into pre-petition, which claims are elevated to administrative claim status upon the Effective Date, as well as the administrative claims resulting from agreed upon post-petition administrative claims resulting from post-petition overpayments.

After reviewing the Debtor's financial abilities and recognizing the importance of allowing the Debtor to remain in business, maintain the employment opportunities provided by the Debtor, and provide the health care services for the residents of the Community that would be lost of Tyrone would be compelled to close, HHS and the Debtor agreed upon the amounts to be repaid and the terms thereof.

Per the Agreement reached between the Debtor and HHS, the liquidated and allowed administrative claim of HHS, including but not limited to the administrative claim(s) resulting from the assumption of the pre-petition provider agreement which elevated said pre-petition claims to administrative claims, as well as all claims for overpayments that occurred through the Effective date, shall be allowed in the amount of $716,419.00, as summarized in the Disclosure Statement In Support Of Plan Of Reorganization Of Debtor In Possession Dated March 1, 2010. The parties also agree that for the period from June 30, 2009 through August 17, 2009, HHS recouped $120,225.00 of June 30, 2009 overpayments by withholding 20% of the amounts due Tyrone in Medicare payments, while the parties were negotiating regarding the 5 year extended repayment schedule. For November of 2009 through March of 2010, monthly payments of $11,075.00 were made to HHS. In addition, a credit of $20,123.00 was applied against the overpayment pursuant to a letter of February 24, 2010, resulting in repayment of $195,723.00 as of March 3, 2010, leaving a balance due as of March 3, 2010, of $520,696.00 for all claims asserted or assertable by HHS for Medicare overpayments that occurred prior to March 3, 2010.

The parties have agreed that the remaining overpayment balance, which is primarily the result of the assumption of the pre-petition Provider Agreement, to wit, the sum of $520,696.00 as of March 3, 2010 (less all sums withheld toward or paid upon said obligation since March 3, 2010), shall be determined to be the Adjusted Class 8 claim. The Adjusted Class 8 claim shall be in an amount equal to $520,696.00 less any and all payments made by or credits determined to be due to the Debtor from and after March 3, 2010 upon the Adjusted Class 8 claim as of March 3, 2010.

The Debtor shall, commencing from the Effective Date forward, continue making the monthly payment of $11,095.00 per moth until the amount of overpayments, including amounts agreed upon for pre-petition periods that were, as the result of the assumption of the Provider Agreement(s) entered into pre-petition, and post-petition overpayments, and as are defined as the Adjusted Class 8 claim, are repaid in full.

Upon payment of the allowed Class 8 claim, all other assertable claims of HHS for the period through the date of confirmation shall be deemed discharged, disallowed and not allowable in this case.

As to the Class 9 Claims, at or prior to the Effective Date, the Debtor/ Reorganized Debtor shall file any Motion To Reject Executory Contracts that it intends to reject. Rejection shall be dependant upon approval of the Motion by the Court, after notice and hearing.

Any Executory Contract not rejected shall be deemed assumed. The Reorganized Debtor shall, within not more than thirty (30) days from the Effective Date, cure any existing arrearages on said assumed Executory Contract, and thereafter, the Reorganized Debtor and the party to the assumed contract shall be governed by the terms of the contract, unless the parties otherwise agree.

In the event that the parties cannot agree upon the amount, if any, needed to cure the arrears, if any, within thirty (30) days of the Effective Date, then the non-debtor party shall have a period of fifteen (15) days to file a Motion Seeking A Determination Of Amount Of Arrears Required To Be Paid To Cure And Assume Executory Contract,

which shall be adjudicated by the Court in due course, and the amount, if any, determined by Final Order Of Court to be the cure amount shall be paid in full within thirty (30) days of the entry of a Final Order determining the amount(s) of the arrearages required to be paid. The failure of the non-debtor party to the executory contract to have filed the referred to Motion Seeking A Determination Of Amount Of Arrears Required To Be Paid To Cure And Assume Executory Contract shall irrevocably constitute an agreement that the amounts as averred by the Debtor/Reorganized Debtor are correct and the amount required to be paid.

Holders of executory contracts that are rejected shall, per the Rule of Bankruptcy Procedure, have the specified time period to file a claim for rejection damages, and all parties in interest, including the Debtor/Reorganized Debtor and the Committee reserve all rights to object thereto. To the extent, if any, a claim for rejection damages is timely filed and allowed, the same shall fall into and be a Class 13 claim.

Upon the Effective Date, the allowed Class 10, 11 and 12 claims, if any, shall be paid in full.

Upon the Effective Date, the sum of $1,050,000 shall be disbursed to counsel for the Official Committee of Unsecured Creditors, who shall, subject to the options provided for infra, be responsible for disbursing said funds on a pro-rata basis to the holders of allowed Class 13 claims as the Disbursing Agent.

The Committee shall have the option, as determined by majority vote of the members of the Committee that vote upon the matter, of objecting to any of the claims of any asserted Class 13 claimant or not objecting thereto. In the case of an objection to a Class 13 claim, which must be filed within not more than 60 days of the Effective Date, the amount that said objected to claim would receive shall not be distributed, but rather the same shall be retained in escrow by the disbursing agent pending a determination by the Court of the allowability, if any, of said claim, or a settlement of the amount, if any, of said claim to be allowed that was approved by the Court.

The initial Class 13 distribution shall be effected within 90 days of the Effective Date.

When economically prudent, subsequent distributions shall be made by the disbursing agent based upon the resolution of the disputed claims.

The disbursing agent shall be entitled to compensation for the disbursing agent's services at his/her/its prevailing rate(s), and said compensation and reimbursement for costs advanced shall come from the fund and earnings thereon, once approved by the Committee, or if a dispute arises, by the Court after notice and hearing. To the extent that the Committee approves the retention of special counsel to represent it in any claim objection, the compensation and reimbursement for costs advanced by special counsel shall come from the fund and earnings thereon, once approved by the Committee, or if a dispute arises, by the Court after notice and hearing.

No distribution shall be made upon the Class 14 claim(s).

Upon the Effective Date, the Class 15 claimants shall receive one time lump sum payments in the following amounts, which shall be in full satisfaction and discharge of their Class 15 claims (as well as the said claims as against the Debtor's defunct affiliate, Tyrone Medical Associates, Inc.), to wit:

    (a)   Thomas Bartlett, the sum of $50,000.00;
    (b)   Kimberly Gummo, the sum of $25,000.00;
    (c)   The United States of America, $75,000.00,

and the parties, with the consent and approval of the U.S., shall cause, as to the Debtor and its defunct affiliate, Tyrone Medical Associates, Inc., the District Court action to be withdrawn and discontinued with prejudice.

No distribution shall be made to the holders, if any, of allowed Class 16 claims.

Whenever used in this Plan, the "effective date" or "Effective Date" of the Plan shall be 30 days from the date the Order of Confirmation becomes final, and not subject to further appeal.

## VI.  COMPARISON WITH CHAPTER 7 CONVERSION/ LIQUIDATION

The pending Plan of Reorganization, it is submitted, produces a substantially greater return to creditors than a Chapter 7 liquidation.

In a Chapter 7 liquidation, the Debtor's assets would likely be liquidated by a Trustee. Experience has shown that such a liquidation rarely brings the "highest and best price", rather, since the sales are "distress" type sales, the prices are usually below what could be obtained via orderly negotiated sales.

Collecting amounts due from third party payors could become burdensome, as the third party payors contracts generally require notice periods before service to those covered by the third party payor are required to seek alternate health care providers. In a conversion, it is unlikely a Trustee would operate the facility, and therefore claims for set-off and/or recoupment could be asserted against the receivables.

Additionally, it is noted that the principal building was constructed for use as a hospital. Its design and layout make it extremely difficult and costly to convert it to another use.

Another problem lies with the reverter referred to supra. The donor/grantor of a substantial portion of the lands had provided that in the event the lands cease being used for hospital purposes, then and in such case the lands revert to the donor/grantor, its successors and assigns.

While in a Chapter 7 case, it is projected that there would be little if any distribution to unsecured creditors, under the Plan, if the United States consents to its Class 15 treatment, the Class 13 creditors get an assured payment of $1,100,000, which would be paid in full on the Effective Date, and that is projected to result in a distribution of approximately 19.3% of the projected and filed Class

13 claims.

However, given the secured debt, and the projected administrative costs of litigating the numerous issues that would arise in the Chapter 7 case, as well as the difficulties inherent in collecting receivables in a Chapter 7, the Debtor feels it is likely that little, if any, distribution would occur to the holders of general unsecured claims not entitled to priority in a Chapter 7, particularly when the amounts due HHS for Medicare overpayments would, as to the post-petition periods, be entitled to immediate payment rather than payment over the agreed upon 5 year time frame.

If the case were converted, it is projected that Classes 1, 2 and 3 would be paid in full.

It is further projected that Classes 4, 5, 6 and 7 would be paid in full.

Class 8 is projected to receive a portion of its claim, which would be the overpayments that were made post-petition and therefore are administrative claim, however, it is projected that it would received nothing on its overpayments for the periods prior to the commencement of this case.

Classes 9 through 16 are projected to receive nothing in a Chapter 7.

Finally, in a Chapter 7 case, another level of administrative expenses comes into play, which would involve the expenses in a 7 for the Trustee, the Trustee's counsel and accountant, and the costs of preserving, collecting and selling assets.

Moreover, in a Chapter 11, distributions commence within a relatively short time after the "effective date", whereas in a Chapter 7 case, no distribution occurs until the approval of the Final Accounting And Distribution Schedules, which, given the nature of the assets in this case, and the anticipated litigation regarding claims and the liquidation of the assets, would be expected to take at least 48 to 52 months, to complete.

As such, it is submitted that the return to creditors is substantially greater in a Chapter 11 under the pending Plan than would result in a Chapter 7 case.

## VII.   FEASIBILITY OF THE PLAN

Feasibility regarding the Plan involves an analysis of the probabilities that the Debtor will be able to comply with the terms of the Plan and fulfill its obligations.

It is submitted that the Plan, as proposed, is feasible.

The Plan contemplates the distribution of proceeds from available funds for payment of unsecured creditors and the administrative claims except for the Class 8, which will be paid by the Debtor going forward from operations income.

Attached as Ex. "A" and "B" are cash uses upon the Effective Date to meet the administrative Claims, underlying assumptions, as

well as cash flow budgets and forecasts for the life of the Plan. It is submitted that the forecasts are reasonable as to improvements in the Debtor's performance, particularly when the post-petition performance is considered.

To the extent that any creditor desires the same, the Debtor's business plan and projections are available for inspection and review by contacting debtor's counsel in writing and requesting the same. The said document is approximately 45 pages in length.

Based upon the above, it is therefore believed that the Plan is feasible.

## VIII. CONCLUSION

This Disclosure Statement has been prepared on behalf of the Debtors in accordance with Section 1125 of the Bankruptcy Code, and has been determined by the Court, after notice and hearing, to contain information to allow creditors entitled to vote on the Plan to make an informed decision regarding the advisability of approving or rejecting the Plan, as proposed. All creditors should carefully review the schedules, pleadings in the case, monthly financial reports, and the Plan and related Disclosure Statement to determine whether their best interests and those of similarly situated creditors will be best served by confirmation of the proposed Plan or rejection of the same, and the possibility of conversion and liquidation.

If after reviewing the relevant information questions remain as to the terms of the Plan and/or their effect, it is recommended that the creditor contact counsel of his/her/its choice knowledgeable in bankruptcy matters.

SPENCE, CUSTER, SAYLOR, WOLFE & ROSE, L.L.C.
By /s/ James R. Walsh
James R. Walsh, Esquire
400 AmeriServ Building
P.O. Box 280
Johnstown, PA 15907
(814) 536-0735
Pa. I.D. # 27901
JWalsh@Spencecuster.com
Attorneys for Debtor-In-Possession

JRW/LAPTOP III/Tyrone Hospital/Plan Of March 1, 2010 Disclosure/3-10-10, clean